# EXHIBIT 2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

Case No: 4:23-CV-05034-JST

SHERRY STRICKLAND, individually and
on behalf of all others similarly situated,
Plaintiff,
vs.
SUNRUN INC.
Defendant.
___________________________________/

LOCATION: Remote Audio-Video Communication
November 10th, 2025
10:00 o'clock A.M.

# DEPOSITION OF SHERRY STRICKLAND

Taken before Andrea Denise West, Registered Professional Reporter, Florida Professional Reporter and Notary Public in and for the State of Florida at Large, pursuant to a Notice of Taking Deposition filed in the above-styled cause.

APPEARANCES:

ON BEHALF OF THE PLAINTIFF(S):
OLIVER LAW
BY: DANA OLIVER, ESQUIRE
8780 19TH STREET, SUITE 559
RANCHO CUCAMONGA, CA 91701
dana@danaoliverlaw.com

ON BEHALF OF THE DEFENDANT(S):

KELLEY DRYE & WARREN LLP
BY: LAURI A. MAZZUCHETTI, ESQUIRE, and
GLENN T. GRAHAM, ESQUIRE
7 GIRALDA FARMS, SUITE 340
MADISON, NEW JERSEY 07940
(973) 503-5900
lmazzuchetti@kelleydrye.com
ggraham@kelleydrye.com

ALSO PRESENT:
EMILY CLARK, ESQ. - KELLEY DRYE & WARREN LLP



I N D E X


| WITNESS: | PAGE |
|---|---|
| TESTIMONY OF SHERRY STRICKLAND | |
| Direct Examination by Ms. Mazzuchetti | 4 |
| CERTIFICATE OF OATH | 189 |
| CERTIFICATE OF REPORTER | 190 |


E X H I B I T S


| Defendant's | Description | PAGE |
|---|---|---|
| Exhibit No. 1 | Strickland000012 | 23 |
| Exhibit No. 2 | LinkedIn Page | 39 |
| Exhibit No. 3 | MPX Complaint | 71 |
| Exhibit No. 4 | MPX Affidavit | 77 |
| Exhibit No. 5 | Text Screenshot Redacted | 102 |
| Exhibit No. 6 | Conway Declaration MPX Case | 106 |
| Exhibit No. 7 | IP Address Lookup | 109 |
| Exhibit No. 8 | Jornaya Report SUNRUN-SS-001122 | 115 |
| Exhibit No. 9 | Interrogatory Responses | 119 |
| Exhibit No. 10 | Complaint | 128 |
| Exhibit No. 11 | Screenshot STRICKLAND00001 | 132 |
| Exhibit No. 12 | Xfinity Billing Statement | 136 |
| Exhibit No. 13 | TCPA SUNRUN-SS-001471 | 160 |
| Exhibit No. 14 | Jornaya Report SUNRUN-SS-001505 | 164 |
| Exhibit No. 15 | Jornaya Report SUNRUN-SS-001501 | 166 |
| Exhibit No. 16 | Verisk SUNRUN-SS-001730 | 168 |
| Exhibit No. 17 | Screenshot STRICKLAND00002 | 181 |




Thereupon, the following proceedings were held:
Thereupon:
SHERRY STRICKLAND
was called as a witness, and having been first duly sworn, was examined and testified upon their oath as follows:
THE WITNESS: Yes.
DIRECT EXAMINATION
BY MS. MAZZUCHETTI
Q. Ms. Strickland, my name is Lauri Mazzuchetti. I represent Sunrun in the lawsuit that you have brought. Can you please state your full name for the record?
A. Sherry Lee Strickland.
Q. And have you ever gone by any other name, Ms. Strickland?
A. I was Sherry Lee Khashogji at one point. I was married. It was my married name.
Q. Can you spell that for us, please?
A. K-H-A-S-H-O-G-J-I. And my maiden name is Odom.
Q. And, Ms. Strickland, if you wouldn't mind taking us through the chronology of when you had the last name Odom, when it changed to your married name, and then when it changed to



Strickland?
A. I was born an Odom, and then at 17 I married Khashogji. And then at 18 -- well, we were divorced within the year, of course. And then at -- when I was 18 I became a Strickland and I've been a Strickland ever since.
THE REPORTER: Is that O-D-E-M or O-D-U-M?
THE WITNESS: O-D-O-M.
BY MS. MAZZUCHETTI
Q. Ms. Strickland, is Strickland the last name that you married into, or is that --
A. Yes, ma'am.
Q. So when did you become Strickland?
A. When I was 18. I think it was '84.
Q. So you divorced your first husband and then married someone by the last name of Strickland?
A. Yes, ma'am.
Q. Where are you presently, Ms. Strickland?
A. Lake City, Florida.
Q. Are you at your home?
A. Yes.
Q. And it appears that -- are you

Page 46

spell that?
THE WITNESS: I don't know how to spell Farideh.
MR. OLIVER: I'll spell it for you. F-A-R-I-D-E-H.
THE REPORTER: Okay. And the other name?
MS. MAZZUCHETTI: Heidarpour is the law firm, H-E-I-D-A-R-P-O-U-R.
THE WITNESS: Okay. While ya'll are doing that, I need to go to the bathroom.
MS. MAZZUCHETTI: Okay. Let's take a break then. Would you like five or ten minutes, Ms. Strickland?
THE WITNESS: Five minutes is good.
MS. MAZZUCHETTI: Okay. It's about 10:53 a.m. East Coast time. Why don't we just resume at 11:00, to make it a nice round number. and I'll use the restroom as well.
THE WITNESS: Okay. Thank you.
MS. MAZZUCHETTI: All right. Thank you.
(Whereupon, a brief recess was taken.)

Page 47

BY MS. MAZZUCHETTI
Q. Ms. Strickland, we're back on the record. Did you have a nice break?
A. Yeah. I just used the bathroom.
Q. Did you speak to anybody on your break?
A. Tyre came in, but he's not out here. He's cold.
Q. Did you speak with anybody else?
A. No, ma'am.
Q. Did you make any phone calls?
A. No, ma'am.
Q. Any text messages or emails?
A. I reviewed a text message from an employee that I have out on workmen's comp.
Q. Any communications whatsoever about the lawsuit during the break?
A. No, ma'am.
Q. Okay. Did you review any documents during the break?
A. No, ma'am.
Q. Just before the break you were testifying that you gave all of your information to your counsel, Mr. Heidarpour, and his assistant, was her hame Faraway (ph)?

Page 48

A. Farideh.
Q. Farideh. What did you provide to them?
A. I gave my account information because I was working. Ma'am, I don't have a lot of time. I mean, this job is 24/7. It never ends. I don't have a lot of time to sit and go through things, so I let her do it.
Q. Understood.
A. It's just the way it is.
Q. I understand more than you know. So did you provide Mr. Heidarpour and Farideh with your user name and password for your Xfinity account?
A. I did.
Q. Do you remember when you did that?
A. No. I don't remember the exact day and time, no.
Q. How did you first become acquainted with Mr. Heidarpour?
A. I saw it -- I saw his name on the internet and I called them because -- and I'm going to tell you why. At the time these people were calling me, my 90-year-old biological father was diagnosed with dementia. At first he

Page 49

was not in hospice. We had people coming to the house trying to keep him out of a home and he was combative. Not with me personally, but with other people, including his wife.
And we were trying to keep him in his home. He was ill. I mean, he had diabetes severely and something I didn't know until I went to the doctor with him, he had kidney disease. And every time my phone rang, I would get distracted at work and she's looking at me. You know, they watch you pretty closely because they want to make sure you're within standards. It was rough because when my phone rang I would freeze because I'm thinking it's my dad. He's not -- He's almost 90 years old.
Q. And are you talking about your stepfather, Ms. Strickland, who lived with you?
A. No, ma'am. I'm talking about my real father. My stepfather died in 2007.
Q. Okay.
A. I was lucky, I had two fathers, both of them very much a part of my life.
Q. That is wonderful. So when did you first become acquainted with Mr. Heidarpour?
A. In July of 2023 I think it was,

Q. Okay. At any time were you presented with written questions to answer in connection with this lawsuit?
A. No, ma'am.
Q. At any time were you presented with requests related to -- seeking for you to produce to opposing counsel, my team, documents or other records that you have?
A. No.
Q. Were you ever asked to review the complaint in this matter?
A. Of course I was. The documents that I signed.
Q. Did you review the complaint before it was filed?
A. I did.
Q. What is your understanding of what's occurred in this lawsuit thus far?
MR. OLIVER: Objection to the form of the question. You can answer.
THE WITNESS: Explain what you're asking me for?
BY MS. MAZZUCHETTI
Q. Like what is your understanding, if any, about what has happened in the lawsuit thus



far?
A. Ma'am, all I know is they aggravated the stew out of me at a time when I was emotionally distressed.
Q. Do you know anything about the court proceedings that are underway or any of the stages that have occurred since you filed the lawsuit?
A. I know they offered one -- they made one offer which was rejected because I didn't feel like it was in the best interest of the class.
Q. Why wasn't it in the best interest of the class?
MR. OLIVER: Objection, objection. If you can answer that question without referring to communications with any of your counsel, then you can answer if you understand.
THE WITNESS: I cannot. I mean --
BY MS. MAZZUCHETTI
Q. So you just testified, Ms. Strickland, that you didn't accept an offer because you determined it was not in the best interest of the class. But you can't tell me



what you meant by that; is that correct?
MR. OLIVER: Objection. Hold on. Just objection, I think it mischaracterizes, but if you understand answer.
THE WITNESS: I don't understand really what you're asking me for.
BY MS. MAZZUCHETTI
Q. I'm asking you to explain. You told me that you rejected an offer because you didn't believe it was it in the best interest of the class. I would like to know what you meant by that?
MR. OLIVER: Objection. Again, if you can answer that question without referring to any communications with counsel, you can answer.
THE WITNESS: I cannot. I cannot.
BY MS. MAZZUCHETTI
Q. When is the last time your attorney sent you documents related to this lawsuit to look at? I don't need to know what they were. I just want to know the last time you received legal documents related to the lawsuit.
A. I don't remember the exact date. I



think it was last week. We covered -- I looked at documents. I don't remember the exact date.
Q. What did you do to prepare for this deposition?
A. I did speak to Dana yesterday.
Q. And you said that was about 15 minutes?
A. Yes, ma'am, somewhere around there, 15, 20 minutes. I don't know.
Q. Did you do anything else to prepare for this deposition?
A. No, ma'am.
Q. Did you review any documents to prepare for this deposition?
A. No, ma'am. I looked at the complaint. I did look at the complaint.
Q. Did you look at anything other than the complaint?
A. No, ma'am.
Q. Do you know which version of the complaint you looked at? It's been amended a few times.
A. The final. I have copies of it.
Q. Other than the complaint, have you reviewed any other documents related to this

Page 74

Ms. Strickland the signature block.
BY MS. MAZZUCHETTI
Q. Ms. Strickland, you see there's a signature block here with Avi Kaufman's typed signature; do you see that?
A. Yes, ma'am.
Q. I can tell you that your signature does not appear on this document, but we can have Emily scroll through so you can see that. Emily, go ahead.
A. Okay. I can see you scrolling, but I can't read that.
Q. Okay. We'll go a little bit slower. let's look at the very front page, Emily. Ms. Strickland, I can represent to you that is a complaint that was filed against MPX Insurance Services, Inc. filed in the Southern District of Florida. Are you familiar with that lawsuit?
A. Yeah. That's probably the one I got the 2500 from.
Q. And have you ever seen this document before?
A. I have seen it. I don't know if -- I don't remember if I signed it or not. But like I told you, once it was over, it was out of

Page 75

my head.
Q. Emily, if we can scroll down to the factual allegations on Page 3. And do you see, Ms. Strickland, do you see Paragraph 17 says, the phone number at issue is Plaintiff's telephone No. 386-288-XXXX. Do you see that?
A. Yeah, [redacted]. Yeah, that's the -- as I told you, I was getting calls from the insurance company but, you know, tons of them.
Q. And in that suit you decided to accept $2,500 in resolution?
A. Well, that was my part of it. I don't know anything else about anybody else's part.
Q. Okay.
A. I was only concerned with me and it was, as I told you, I was getting them back to back. And they're there in my phone records. That was the purpose of giving that information to my attorney, so I didn't have to deal with it.
Q. And when you say you provided information to your attorney, was it at the same time that you provided information to your attorney about the solar and Sunrun related

Page 76

calls that you provided information related to the --
A. I do not remember, ma'am. All I know is I provided the phone records and told them where I was getting the phonecalls from and who they claimed to be, and the fact that there were so many. There were lots of phonecalls.
Q. In the MPX case, did you act in the best interest of the class in that case?
MR. OLIVER: Objection, calls for a legal conclusion, calls for speculation. If you know the answer to that question, that's fine.
THE WITNESS: I don't.
BY MS. MAZZUCHETTI
Q. Do you know if you were representing a class in that case, Ms. Strickland?
A. I mean, I'm not sure about that. All I know is the people aggravated me and it was enough.
Q. You yourself used the phrase before, the best interest of the class. What does it mean to act in the best interest of a class?
MR. OLIVER: Objection. If can you answer that without referring to

Page 77

communications with counsel, then --
THE WITNESS: I cannot.
BY MS. MAZZUCHETTI
Q. So you're unable to tell me what your understanding is of the role as a class representative; is that correct?
MR. OLIVER: Objection, form of the question. If you understand that, go ahead and answer it.
THE WITNESS: I go on the basis of my attorney's suggestion.
MS. MAZZUCHETTI: Let's pull down that exhibit. Let's pull up, Emily, the Affidavit of Sherry Strickland submitted in the MPX case.
(Whereupon, Defendant's Exhibit No. 4 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, I'm placing before you on the screen what we're going to mark as Exhibit 4 to this deposition. Can you see it okay?
A. Yes.
Q. Have you ever seen this document before? Before you answer I will let Emily

Page 82

paragraph, it says that you looked at your website browser history. Do you see that?
A. Yeah.
Q. And do you actually maintain a historical record of your browser history?
A. Yes, on my phone.
Q. For what period of time?
A. Oh, I have no idea what it's on there for. I don't know. I go back sometimes to the same websites with my job, as far as training and other things, so I always maintain because I can just click on it and go right to it. Also, it has various accounts that I have had.
Q. Understood. When you said that you reviewed your browser -- your website browser history, does that mean you reviewed the website browser history on your Samsung device?
A. Yeah. It's the only thing I use, other than my work thing. And then my laptop doesn't work anymore, I can't get it to update. So I don't have access -- I have access but I don't use the computers in the house. The kids use them.
Q. Okay.

Page 83

A. So the phone is, you know, my phone is a fold. As you see, it opens to a big.
Q. Thank you.
A. I can probably do things from that phone that I can't do on my computer.
Q. When you say your computer, are you talking about the one you described earlier that's not working at the present time?
A. Yeah.
Q. And did you check your website browser history on that computer before signing this affidavit?
A. I did. I had the attorneys check it. I didn't personally. They did.
Q. You didn't -- in Paragraph 5, I reviewed my website browser history, you didn't personally do that; your attorneys did it?
A. I don't remember whether I did it or they did it, but I had browser history on -- they all have them, even the one I'm on has them.
Q. I'm sorry, what are you talking about; who is they all have them?
A. All of the computers have them. If you go to history.

Page 84

Q. How would your attorneys --
A. I supplied the information to my attorney to review as well.
Q. How did you provide the information to your attorney?
A. Phone shots.
Q. So you showed them your browser history?
A. Yes, ma'am. I'm pretty sure. I don't remember exactly.
Q. You said that your attorneys checked the browser history on your other computer. How did they go about doing that?
A. Because I sent screenshots.
MR. OLIVER: Okay. Hold on a second. Just objection, if you know that without getting that information from your attorney, you can answer.
THE WITNESS: I don't. I don't remember. That's two years ago. I don't remember.
BY MS. MAZZUCHETTI
Q. Okay. I want to look at Paragraph 8 and -- 8, 9 and 10, which you can see on the screen now. It says that, furthermore, the IP

Page 85

address is wrong. This is Paragraph 8. Paragraph 9 says, the IP address for the purported opt-in is 98. and then there's a series of Xs. Do you see that?
A. Uh-huh.
Q. Is that yes?
A. Yeah, I see it.
Q. Then Paragraph 10 says, my IP address begins with a 174. Do you see that?
A. Yes.
Q. Where did you get the information that your IP address begins with 174?
A. Probably from the history. I don't know, ma'am. I went through the attorneys. That's all I know. I know I supplied its history. Believe me, there was a lot of history supplied for months.
Q. Can you provide to us the remaining digits for the IP address beginning 174?
A. It's probably my home address. I'm not sure.
Q. But can you provide to us the rest of the IP address that's referenced in Paragraph 10?
MR. OLIVER: Hold on a moment. Are

you asking her if she's got that in her mind, or whether she can pull it up now, or whether she can provide it subsequent to the deposition? I'm just making sure I'm on the same page as you.

MS. MAZZUCHETTI: Any of the above.

BY MS. MAZZUCHETTI

Q. I presume you don't have your IP address memorized, Ms. Strickland, correct?

A. No, I don't. I would have to pull it up and I don't -- I don't know if I can do it from here.

Q. But somehow you were able to provide it to Mr. Heidarpour for this --

A. Yeah, I'm pretty sure Farideh gave me instructions to get it up, because they checked it thoroughly and I was right there with her.

Q. Were you in person with Farideh?

A. No, ma'am. We were on -- I've never met Farideh in person. I've only talked to her on the phone and she's given me instructions on how to give her the information she needed.

Q. Okay.

A. And I don't remember half of it.



After it was done, it was done. I left it alone. I went about my business. As I told you, my time is valuable.

Q. We understand that.

A. I mean, they're emailing -- they're texting me left and right from the store and I'm trying my best not to pick up my phone and respond. These people can't do anything unless I'm present for some reason.

Q. Understood.

A. So if I'm irritated, it's really not with you guys. It's with them. It's like I'm a God stop.

Q. Well, just let us know when you're focused on your phone and not this deposition so that we can make sure we're understanding what you're dealing with. Okay?

A. Uh-huh. Just so you know too, Alexis is awake. Audrey has gone back to bed. So if -- she's eating right now, so I was able to make sure she got food.

MS. MAZZUCHETTI: Mr. Oliver, would you be able to get us the rest of that IP address?

MR. OLIVER: I will definitely look



into that. So I mean, I don't know the answer to the question, but I think we can communicate and see if we can get that, absolutely.

MS. MAZZUCHETTI: Thank you. It would be great if you could get it during the course of the deposition so we don't have to hold it open.

THE WITNESS: All I can tell you is that the only time I get on the Internet is at home. Other than my job. And the only thing at my job is pertaining to the job.

MR. OLIVER: If I may, depending on how long you think we'll go today, we could take a little bit longer of a break and maybe try to address that. And maybe she might be able to resolve whatever might be going on with her employer, and it would be less of a distraction too.

So if you guys want to do that, that's okay. I mean, not something too long. Ms. Strickland, do you think you can help like by calling somebody at your employment that you could kind of calm



the waters a little bit so that they're not distracting you.

THE WITNESS: Yeah.

MR. OLIVER: All right. Well, that might be a good idea and then I'll attempt to get this information for you as well.

MS. MAZZUCHETTI: Okay. So do you want to take a break now, Mr. Oliver?

MR. OLIVER: I think it might make sense, because I feel like there's kind of a lot going on and might we could make things work better if we just address several of these things all at once.

MS. MAZZUCHETTI: Okay. That sounds fine with me. How long would you all like to take? I know, Ms. West, you may need to eat as well, so I want to be considerate of everybody's time right now.

THE REPORTER: I'm good with 20 minutes.

MR. OLIVER: Do you think that would work, Ms. Strickland?

THE WITNESS: Yes.

you sent a witness an email related to the deposition while the deposition was in progress, correct?

MR. OLIVER: Related to clarifying inaccuracy in the record. Yes, that is correct.

MS. MAZZUCHETTI: Okay. All right.

MR. OLIVER: And for your information -- well, no, go ahead.

MS. MAZZUCHETTI: Go ahead.

MR. OLIVER: No, no. I've said all I want to say.

MS. MAZZUCHETTI: Okay. Well, I am going to keep the deposition open so we'll have to potentially come back here and do this again.

MR. OLIVER: Sure.

MS. MAZZUCHETTI: And I just ask that we not have to go to The Court to produce it. It's clearly improper to be sending emails to The Witness about the case.

BY MS. MAZZUCHETTI

Q. Any other communications, Ms. Strickland, that you've had over the course of these breaks with Mr. Oliver or any other



counsel representing you?

A. No, ma'am. That's the only.

Q. And what clarification did you need to make based upon what Mr. Oliver emailed you?

A. He just reminded me of the conversation.

Q. What conversation?

A. Between Mr. Broderick, Ted and me. I did speak with someone, but I didn't remember his name. I didn't remember his name. I mean, it's two years ago.

Q. What was the date that you spoke with him?

A. I don't know. I'd have to look, but I remember speaking with someone about the insurance.

Q. Where would you look to determine the date that you spoke with Mr. Broderick?

A. In the email, it's got my conversation with him.

Q. Okay. Well, look at the email and tell me the date that you spoke with Mr. Broderick, please.

MR. OLIVER: If you can determine the date by looking at the email, but don't



read the email itself.

THE WITNESS: Yeah, I'm looking. I don't think it has date in here. December 20th, it was Wednesday, 2023.

BY MS. MAZZUCHETTI

Q. In December of 2023?

A. That was when the email was sent. It could have been the day before the 20th. It could've been the 19th of December.

Q. Okay. And was that the first time you spoke with Mr. Broderick?

A. Yes.

Q. And was this conversation over the phone?

A. Yes.

Q. Was it on Zoom like we're doing now or just a regular phone call?

A. Just a regular phone call. I think I was at work on break.

Q. Other than looking at the email Mr. Oliver sent to you, have you consulted any other case documents during the course of the deposition other than what I showed to you?

A. No, ma'am.

Q. Have you talked with anybody other



than the lawyers representing you about this lawsuit at any time?

A. No, ma'am.

Q. Have you talked with your daughter about the lawsuit or your son-in-law?

A. No.

Q. They must be very confused about what it is you're doing on the porch today.

A. Yes, they are. I've just asked them to stay off the porch.

Q. And how long did you spend preparing for today's deposition?

A. Ma'am, there wasn't too much preparation. As I told you, I don't have time for that. When I come home, I have to take care of Lexi and Lexi is a full-time job on top of my regular job. I take both very seriously. She's in there now showing out. I can hear her. I mean, she's okay, though. She's not in harm's way so...

Q. Ms. Strickland, do you know what court you filed this lawsuit in?

THE REPORTER: I'm sorry, can you repeat your question?

MS. MAZZUCHETTI: Do you know what

court you filed this lawsuit in?
MR. OLIVER: Objection as to form. If you know, you know. If you don't, you don't. Just answer.
THE WITNESS: I don't, because I don't remember half of it. I'm pretty -- I remember having a conversation, but other than that, I don't remember much of it. As I told you, my life is full.
BY MS. MAZZUCHETTI
Q. Are you aware that this lawsuit is pending in federal court in California?
A. No, ma'am. I mean, I don't remember. I don't recall. I might have been told. I don't remember.
Q. Are you planning to travel to California to appear for the trial in this matter should there be one?
A. If I have to, I guess I will.
Q. You mentioned previously that you are aware that there was an amount offered to you related to this lawsuit, but you said it was -- you didn't accept it because it wasn't in the best interest of the class. What was the amount offered to you?



A. I believe it was 30,000. I'm not really sure. I don't -- I don't recall every detail.
Q. Do you have an understanding if you accepted that 30,000, what portion you personally would keep versus your lawyers?
A. No.
Q. Do you know whether you would have received any portion of the $30,000 versus your lawyers?
A. No.
Q. You testified previously about a check you received in connection with the insurance case. Do you remember discussing that with me?
A. Yeah.
Q. Was there a settlement agreement in that case?
A. I don't recall. I can't -- I mean, I don't recall, ma'am. As I told you, my life is full and everything's whizzing around me all the time.
Q. We had requested a copy of documents related to other litigations. If you have a settlement agreement, will you please make sure



it gets produced to us?
MR. OLIVER: Objection.
(Cross talk.)
BY MS. MAZZUCHETTI
Q. I'm sorry? I can't hear you, Ms. Strickland.
MR. OLIVER: Well, let me clarify this objection here. I think it's calling for legal speculation, and I don't think -- it lacks foundation. If she understands that, she can answer it, but you're asking her if she's going to do something that clearly she's going to have to converse with her counsel to do. But if she knows how to answer the question, she's welcome to.
THE WITNESS: I don't know any of that. You'll have to get whatever you need from the attorneys.
MS. MAZZUCHETTI: We did ask for it, but we didn't receive it, and we're aware that it existed. So, Mr. Oliver, we would like the settlement agreement, if there is one in the MPX case, produced.
MR. OLIVER: I'll make a note.



BY MS. MAZZUCHETTI
Q. Going back to that MPX insurance case, Ms. Strickland, were you aware of any rulings made by The Court or are you aware of any rulings made by The Court?
MR. OLIVER: Objection. Hold on. I'm sorry. Objection as to the form of the question. You can answer.
THE WITNESS: I mean, they probably told me, but as I told you, ma'am, I don't remember details of a lot of things if it's not pertaining to me. It's been so long ago, a lot of things have happened since then.
BY MS. MAZZUCHETTI
Q. Do you know how long ago you received that check?
A. I can't remember exactly so I can't tell you.
Q. Did you need to share that check with anybody?
A. No.
Q. Do you know when the MPX case concluded?
A. I do not.

Page 102

MS. MAZZUCHETTI: Okay. Let's pull up -- Emily, if you can pull up the PDF that Mr. Oliver sent to us of the IP address and remind me what exhibit we're on.
MR. OLIVER: I'm sorry, is someone going to email me these exhibits by email so that I can compile this after the fact?
MS. MAZZUCHETTI: Yeah, we're going to do that after the deposition.
MR. OLIVER: Okay.
MS. MAZZUCHETTI: I think we're up to Exhibit 5. So, Emily, if you could show this, that Mr. Oliver sent to us.
MS. CLARK: Yes. I'm pulling it up.
(Whereupon, Defendant's Exhibit No. 5 was marked for identification.)
MS. MAZZUCHETTI: Emily, we don't see it yet.
MS. CLARK: I know. One second.
MS. MAZZUCHETTI: Sorry. Sometimes I'm not the most patient person, Ms. Strickland. I think everything can happen really fast so forgive me.

Page 103

THE WITNESS: I'm not either so sitting here is really taking it's toll, but I'm trying.
BY MS. MAZZUCHETTI
Q. Thank you for that. Ms. Strickland, I'm showing you what we are marking as Exhibit 5. Have you ever seen this document before? Emily, maybe scroll to the top.
A. Yes. It's a screenshot.
Q. Is this a screenshot from your phone?
A. I believe so. I'm not --
MR. OLIVER: Objection. Hold on a second. Just objection, ambiguous. But if you understand, go ahead and answer.
BY THE WITNESS
Q. Ms. Strickland, do you believe this is a screenshot from your phone?
A. I believe so. I'm not really sure, though, because, you know, like I said, I gave them the information and she gave me instructions on how to get there.
Q. So do you remember visiting a site, WhatIsMyIPAddress.com to come up with the information presented on this Exhibit 5?

Page 104

A. Tyre just walked on the back porch.
Q. Okay.
A. He's grabbing his cigarettes and leaving. Okay, he's gone now.
Q. Okay. My question was, do you remember going to the website WhatIsMyIPAddress.com to pull up the information that is reflected on this screenshot?
A. Yes, ma'am. I actually was given instructions over the phone by Farideh on how to get my IP address, which I think I told you ahead of time.
Q. And did you do this search on your Samsung Galaxy phone?
A. Yeah. It's the only access I have.
Q. Okay. I would like for you to take your Samsung Galaxy phone now and go to that same website, which is WhatIsMyIPAddress.com.
MR. OLIVER: I'm going to allow this this one time, but I'm almost tempted to not let this happen. So go ahead and do that.
MS. MAZZUCHETTI: Emily, you can take down Exhibit 5.
THE WITNESS: Yes, ma'am.

Page 105

BY MS. MAZZUCHETTI
Q. Can you show or put your screen up to the camera so we can see what it says? Maybe it's best to look at it that way.
MR. OLIVER: Yeah, go ahead.
THE WITNESS: You want to see what my IP address is? Same thing.
MR. OLIVER: Put it up there. Lift it a little higher, please. Higher.
BY MS. MAZZUCHETTI
Q. Can you read to us the top line? The 2600.
A. [redacted] -- no, not dot.
Q. A colon?
A. Yes. So it's [redacted] -- you just got that. You didn't get it?
Q. It's just hard -- if you hold it steady, I'll be able to -- I want it on the record. So if you hold it very steady, I can read it myself. So are you ready? It's [redacted], lowercase b's, colon, [redacted], lowercase [redacted] numeral 0ef. The second IP address listed is 174.[redacted].[redacted]. Thank you.
All right, Ms. Strickland, we're

Page 106

going to pull up the next exhibit, which will be Exhibit 6.
MS. MAZZUCHETTI: Emily, it's the declaration of Jared Conaway.
(Whereupon, Defendant's Exhibit No. 6 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, I can represent to you that we're putting up on the screen as the deposition Exhibit 6 the declaration of Jared Conaway. This is from the MPX action. And if Emily could scroll down to paragraph 4. Paragraph 4, Ms. Strickland, indicates that the Lead Economy operates a website www.foreverhomeinsurance.com for consumers interested in obtaining insurance quotes. And then if you can go to the next page, Emily, paragraph 6. In this website, a record was presented that on June 24th, 2023, there was a website visit to that website where somebody entered the information that you see in paragraph 6.
Do you see that information in paragraph 6?
A. I do.

Page 107

Q. That's your correct information for your name, address, city, state, zip code, email, and phone number, correct?
A. Yes, ma'am.
MS. MAZZUCHETTI: And then Emily, if you could please turn to Page 29 of the PDF.
BY MS. MAZZUCHETTI
Q. Ms. Strickland, we saw in your affidavit previously, you indicated that you looked at a Jornaya report that was attached to Mr. Conaway's declaration. I'm representing to you that this is an exhibit to Mr. Conaway's declaration from the MPX case.
MS. MAZZUCHETTI: Emily, if you could please go to Page -- let's see, the page with the IP address. I can't read which page it is. There we go. We can stop there.
BY MS. MAZZUCHETTI
Q. Ms. Strickland, do you see there's an IP address starting with a 98 in the box at the top of the screen?
A. I can barely see that.
Q. Well, the IP address reads

Page 108

98.[redacted].[redacted].[redacted]. Can you see that?
A. Okay. I see that 98, yes.
Q. And let's flip back to Exhibit 4, which was your declaration or your affidavit, I should say. Ms. Strickland, you indicate at paragraph 4 that you never have been to the ForeverHomeInsurance.com website. Do you see that?
A. Yeah.
Q. Was that an accurate statement?
A. Ma'am, I'm not sure. I know when I got the house, I had to find insurance. I don't remember or recall going to any website like that or I don't recall. It's been a long time ago.
Q. Okay.
A. I'm sorry.
MR. OLIVER: I'm sorry, if I could --
THE WITNESS: When you solicit insurance, how long do they have? Three or four years to continue calling?
MR. OLIVER: Ms. Strickland, hold on a moment, please. I just want to interpose a late objection as to form on the last question, but you're free to move on.

Page 109

BY MS. MAZZUCHETTI
Q. Okay. So bring that exhibit down, please.
A. I know I went through 800 numbers on the phone to get my insurance.
MS. MAZZUCHETTI: And, Emily, if you can put up the NordVPN exhibit. We'll mark that as Exhibit 7.
(Whereupon, Defendant's Exhibit No. 7 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Are you okay, Ms. Strickland?
A. Oh, yeah. I'm fine.
Q. We're going to mark this as Exhibit 7. Ms. Strickland, I'll represent to you that I used a reverse lookup that you can use to see the geolocation of an IP address, and you can see that I looked up this particular IP address on November 8, 2025, and you can see the IP address I searched for starts with the 98. I'll represent to you that that's the IP address in the Jornaya report attached to Mr. Conaway's declaration. And the results are in the blue box. Do you see that?
A. Okay.

Page 110

Q. The results show an IP address pointing to an Internet service provider Comcast Cable, correct?
A. Comcast is my provider, Xfinity.
Q. That's your provider, correct?
A. Yes.
Q. And it says the IP address also points to Lake City, Florida. Do you see that?
A. Yes.
Q. And is it your testimony --
A. But almost everybody in Lake City has Comcast.
Q. Okay. But is it your testimony that it was just a coincidence that somebody visited the foreverhomeInsurance.com website and populated your information from an IP address that's in your hometown?
MR. OLIVER: I'm going to object to the form of the question.
THE WITNESS: I have no idea, ma'am.
BY MS. MAZZUCHETTI
Q. Well, did you fill out --
A. I have no idea.
Q. Did you fill out the web form on foreverhomeinsurance.com?

Page 111

A. I do not recall filling out a web form for Forever Home.
Q. Is it possible that you did?
MR. OLIVER: Objection to the form of the question.
THE WITNESS: As I said, I do not recall.
BY MS. MAZZUCHETTI
Q. My question was whether -- I know you don't recall, but is it possible then that you did?
MR. OLIVER: I'm going to object. I think that's just a matter of inference. Her opinion on it is irrelevant.
BY MS. MAZZUCHETTI
Q. Ms. Strickland, you can answer my question. We have an IP address that points to Lake City, Florida, with all of your accurate information populated.
A. Because my daughter has my information. I mean, she knows my information better than I do. I know I've never been on that website.
Q. Do you believe that your daughter may have populated the website?

Page 112

A. I do not know. And she would not -- I'm pretty sure she doesn't remember that far back.
Q. Have you talked to your daughter about whether she's ever populated a web form with your information?
A. No, I haven't.
Q. Have you ever asked her whether she --
A. I know she knew I was looking for insurance. The insurance that I had on the house wasn't enough, and they were trying to -- the insurance went so high, that's why I called GEICO and used the 800 number.
So, I mean, I have no idea. But I know personally I've never been on Forever Home. Personally, I have never been on Forever Home and filled out any form.
Q. Does your daughter help pay the cost of the insurance on your home?
A. The cost of the insurance is included in my house payment, ma'am, and nobody helps me pay that house payment but me.
Q. Does your daughter or anybody residing at your house help you with any

Page 113

household expenses?
A. Of course, they do.
Q. What exactly --
A. They also take care of Alexis while I'm working so that she's not in a facility that will not keep her the way she is accustomed to being kept. So that is mainly why those two are here, because they help me take care of my grand. And it is not her daughter. It is her niece.
Q. Understood. Does your daughter or anyone else residing in your home help pay the electricity bills?
A. I pay the electric and the mortgage.
Q. What household expenses does your daughter assist with?
A. She pays the cable bill and buys their food to eat with.
Q. Does that mean she pays the Xfinity bill that your cellphone is on?
A. Yes. If she doesn't pay it, I do. And a lot of times, I wind up paying that, too.
MR. OLIVER: Is this an exhibit, Laurie?
MS. MAZZUCHETTI: Yes.

Page 114

MR. OLIVER: What number is it, I'm sorry?
MS. MAZZUCHETTI: Seven.
MR. OLIVER: Thank you.
BY MS. MAZZUCHETTI
Q. Does Audrey have access to your Comcast account or the Comcast account --
A. She does, because we monitor -- we have cameras on Alexis, and we monitor that together. Alexis is nonverbal so we watch her in the event that anything happens. Tyre is a male. When he's taking care of her, we watch her. She throws herself down sometimes bruising herself, and we want to make sure that nobody thinks that we did -- we put those bruises on her.
Q. I understand.
A. Audrey does have access. Tyre does not.
Q. Okay. Does Audrey have a Comcast.net email on the account?
A. No, ma'am.
Q. Does she use the Internet service under the account?
A. Yes.

Page 115

Q. And her cellphone, is it on the Xfinity account or some other provider?
A. No. She has another provider. The only cellphone that is on my Xfinity account is the [redacted]. There is no other phone on that account, just mine. There used to be my mom's, but she's no longer with us and the phone is no longer on there.
MS. MAZZUCHETTI: Give me a moment to pull up the next exhibit. Emily is going to pull up the next exhibit, which we'll mark as Exhibit 8.
(Whereupon, Defendant's Exhibit No. 8 was marked for identification.)
MS. MAZZUCHETTI: Court reporter, am I correct, Andrea, that we're on Exhibit 8?
THE REPORTER: Correct.
BY MS. MAZZUCHETTI
Q. Thank you. Ms. Strickland, I know you're -- well, I don't know if you've ever viewed this document before. I can tell you that we produced it in discovery related to one of the web form completions that occurred with respect to solar. Have you ever browsed the Internet looking for solar products or services?

Page 116

A. I can tell you I haven't because I don't have the money for it. I didn't have the money for it then and I don't have it now.
Q. Have you ever discussed solar with your daughter or your son-in-law?
A. No.
Q. Have you ever discussed solar with anybody?
A. No.
Q. Let's scroll through the Jornaya report to the IP address. Stop there. Okay. And Ms. Strickland, I can represent to you that Sunrun was provided with information that a web form was completed with your information, your name, your address, your email, and coming from this IP address that starts with a 98. Do you see that?
A. Yes.
Q. That's the same IP address that was on the -- attached to the declaration of Jared Conaway from the MPX case. Do you have any explanation for two web forms weeks apart being completed from the same IP address in Lake City?
A. I do not, and I don't know where it could have came from because I don't have --

Page 117

like I told you, in my positions, I don't go on the web for personal reasons.
Q. You never go on the web for personal reasons?
A. Never, ever on my job because they're -- like I told you, they're very strict about it. IT department monitors everything that goes through their systems.
Q. I'm not talking about your job. I'm talking about that this is a IP address that tracks to Lake City, Florida.
A. And my job is in Lake City, Florida.
Q. On July 8, 2023, you were in between Five Guys and --
A. I was in Crystal River.
Q. Well, you actually testified that you didn't start training until the following week.
A. It might have been. I don't know. I don't remember the dates exactly. I know I started in July.
Q. Okay. Well, we already went through that time line, and it would have been the following week. But I'm asking you if you have any idea who would have populated these web

Page 138

to you. And I have not identified a single call that you received on your phone that you answered.
A. Yeah, because I stopped answering. Stopped.
Q. But my question is, did you ever answer a single call because we have no record that you did?
A. For Sunrun, yes, I did.
Q. Where would we have a record of a call that you answered?
A. You would have to pull them from the 8th, the 9th. I have no idea, but I know I talked to someone and asked them to stop calling. I talked to a bunch of people during that time and asked them to stop calling.
Q. Well, you testified earlier that you were receiving calls from a variety of different companies, correct?
A. Yeah, but I can't tell you exactly who they were because that's been 2023.
Q. I understand. That's why I'm asking you, like how is it that you definitively know you answered a Sunrun call versus a call from somebody else?

Page 139

A. Based on the numbers. I don't know. I don't know who I answered for and who I didn't, to tell you the truth. I can't recall it at the moment, but I'm pretty sure when I talked to the attorney, I was very much aware of it.
Q. So I have looked through this. I presume this is your phone bill. It spans from --
A. July 12th.
Q. It spans from June 27th, 2023, to July 12th.
MS. MAZZUCHETTI: Emily, if you can just go to the back of the document. See, there's several pages. And let's see the first date. You see there's June 14th. Let's go down. June 13th. So this covers a time period. Let's go back to the top, Emily.
BY MS. MAZZUCHETTI
Q. In the right-hand corner, June 12th to July 12th, do you see that in the right-hand corner?
A. I do.
Q. I don't see a single inbound call

Page 140

that was answered from the (386)832-0297 phone number, which is the phone number that you say in the complaint from which you received the calls that are at issue in this lawsuit. Are you certain sitting here today that you answered a phone call from Sunrun?
A. I'm positive. I remember talking to somebody dealing with solar. She proceeded to give me her spiel. And I asked, please don't call me again.
Q. You testified earlier that you had a lot of different companies calling you.
A. I did. And one was the insurance. I remember that as well.
Q. Are you able to say with certainty and based upon a recollection that you spoke with somebody from or about Sunrun versus some other solar company?
A. I don't think I had any other solar company calling me. I wish I could find the document that was left in my mailbox.
Q. My question to you is, do you have a specific recollection of speaking to somebody that was from Sunrun or about Sunrun products?
A. Specifically, no, ma'am.

Page 141

Q. Specifically, no?
A. I don't have a specific recollection of speaking with someone with the insurance, but I do know that I spoke with them. That part of it, I do know.
Q. And we've now looked at Exhibit 11.
MS. MAZZUCHETTI: Emily, if you can put it back up.
THE WITNESS: I spoke with someone from the solar company about not calling me again. And at that time, as I told you, you're under stress, I'm running, I'm at work.
BY MS. MAZZUCHETTI
Q. Okay. So if you look here, do you see the July 8th phone call at the very bottom? We're looking at Exhibit 11.
A. Yeah.
Q. And that indication on the left-hand side indicates that the call was not answered, correct?
A. It was not. But you have three calls, two calls, and two calls. It doesn't indicate whether all three -- it doesn't indicate whether they were not answered.

Page 142

Q. Let's go up one on July 8th. It looks like there is a recording, like a voicemail symbol on the left side. Do you see that?
A. Uh-huh.
Q. Is that a yes?
A. Yes.
Q. So both of those calls occurred on July 8th but because there was different interactions that occurred, we see one that shows as an unanswered call and another that shows as a voicemail, correct?
A. Correct.
Q. And for the others, we're not seeing a breakout in many instances over multiple days except where there appears to be different actions like a voicemail, where I see July 11th there was a voicemail indication, at least on your screenshot?
A. Yes.
Q. But nothing else indicates that any phone call was answered, correct?
MR. OLIVER: Objection to the form of the question.
THE WITNESS: I don't know.

Page 143

BY MS. MAZZUCHETTI
Q. Does anything on this screenshot show an answered call?
A. Not that I see on this screenshot, no.
Q. Okay. And if we can go back to Exhibit 12. And if we don't see any calls from June 12th to July 12th that were answered, inbound calls to you that were answered between that time range, what are we to conclude, that there were no calls that you answered?
MR. OLIVER: Objection to the form of the question.
THE WITNESS: Hell, it even has some from my daughter that it says I didn't answer.
BY MS. MAZZUCHETTI
Q. Well, I don't know if this is showing whether you answered or not. Where do you see a call you didn't answer?
A. I can't tell. You're only showing me a few of them.
Q. Scroll down. All of these calls have minute durations, and my understanding of Xfinity's bills is that if there's a call that

Page 144

lasts for longer than 30 seconds, it will show up on this call log.
A. Okay. Well, ma'am, how do you -- how long do you think it takes when I'm at work and I've got a manager breathing down my neck and I say, stop calling me, how long do you think that takes?
Q. I do not know. But what I can tell you is, there is no indication on any of the records that you provided, and it's consistent with my client's record, that don't show that any phone call was answered. Okay. We can take this down.
Let's go back to the MPX complaint, please. Look at which exhibit that was. Let's go to Page 4 of MPX complaint, Exhibit 3.
Ms. Strickland, I'm showing you the MPX complaint that states at paragraph 27, and this is verbatim the exact same line out of the complaint against Sunrun, each call that was answered started with a click, pause, and a delay prior to any individual from the Defendant getting on the line. Do you see that?
A. Yeah.
Q. Do you know if this was just a

Page 145

allegation that got carried over rather than --
A. I do not.
Q. -- with your lawyer, that you had actually spoken with somebody, you actually answered a call that you claim was from Sunrun?
A. I do not. I can't answer that. I don't know.
Q. You're not sure one way or the other?
A. No, ma'am. Man, I can't even see it.
Q. And then the next paragraph, paragraph 28 says: This audible click and pause is indicative of the automated system selecting a number to call and then transferring the call to the telemarketing representative. Do you see that?
A. I do.
Q. What did you mean by that?
MR. OLIVER: Objection to the form of the question. Calls for legal conclusion. If you know the answer, answer it.
THE WITNESS: I don't.

Page 146

BY MS. MAZZUCHETTI
Q. Well, did you hear an audible click when you answered a call from the insurance company?
A. I guess I -- yeah, I did. I don't know if all of them were like that, but I do know there was a little bit of a pause.
MS. MAZZUCHETTI: Okay. Let's go to Exhibit 10, Emily, to Page 4 of Exhibit 10.
BY MS. MAZZUCHETTI
Q. Do you see paragraph 25 and 26 are identical to what we saw in the MPX complaint? Do you see that?
A. Yeah.
Q. So do you think this was just carried over from one complaint to the next and not necessarily related to your claims against Sunrun?
MR. OLIVER: Objection to the form of the question. Calls for speculation. If you know the answer, you can answer.
THE WITNESS: I don't know the answer to that.

Page 147

BY MS. MAZZUCHETTI
Q. So sitting here today, you don't know if you answered any of the calls from Sunrun that claims --
A. I can't tell you a date, but I do know that I spoke to someone with Sunrun and asked them to stop calling me, as well as that insurance company on -- I know the insurance company. I said it several times.
MS. MAZZUCHETTI: Bring that down, Emily.
BY MS. MAZZUCHETTI
Q. Did you ever place any calls to Sunrun?
A. I called them twice.
Q. And what happened on those calls?
A. I just asked them to stop calling me and hung up the phone.
Q. So is it your testimony that you answered calls that you received and told them that, or is it your testimony that you placed the calls?
A. I think I did both. I'm not really sure because, as I said, there were many. And I'm not really sure whether I did both or I

Page 148

called or I don't remember. It's two years ago.
Q. The reason I asked, Ms. Strickland, is because we -- as you know, my client does record phone calls, and if there's a phone conversation that occurs, we will have a recording of it.
A. Hopefully you do have the recordings because I did talk to someone there.
Q. We have no recording with your voice on it. We have a record of two calls that lasted for -- one that was one second and one was an immediate hangup. So we don't have any indication that you ever spoke with anybody from Sunrun.
A. Okay.
Q. So that's why I'm looking for some record that would corroborate your statements that you had such conversations, given that we don't have that record. And I haven't seen anything yet to indicate that that occurred.
Okay. Ms. Strickland, you in your ordinary course review your phone bills from Xfinity? I mean, do they mail you a phone bill or do you have to log onto your account in order to --

Page 149

A. I log on, ma'am. And I don't normally review them. I just pay the bill. I mean, as I told you, my job is so demanding, I don't have time to review a phone bill. And then the amount of calls I get, as you saw from that 823 calls, it's a lot of calls. If I'm looking for something, then I review. But there's no -- through the normal course of my life, I don't go through my phone calls at all.
Q. And I apologize if I already asked this, but the MPX complaint was signed by Avi and Rachel Kaufman. Have you ever spoken to either of them?
A. Not that I remember. I mean, I don't -- I could have, but I don't remember speaking to them. I don't remember. I mean, I'm better with faces than names. I don't remember names. I mean, I'm in the hospitality business. I know people by face. I know everybody in this town, but I couldn't tell you -- I can tell you a few of their names because it's been years and years and years of interacting with them. But the majority of them, I mean, I encounter people all the time that act like they've known me all my life and I

Page 150

have no idea.
Q. Let's go back to your interrogatory responses, which are Exhibit 9. Okay. Let's go to Page 2, please. I will tell you, Ms. Strickland, that Interrogatory 1 asked for you to identify the dates and the times of the calls for which you're claiming in this lawsuit, and you can see that there's an itemization of calls from July 8th to the 14th that corresponds to those paragraphs we just reviewed in the complaint. Do you see that?
A. Yeah.
Q. And by my read, each and every one of these says that you rejected a call. There's nothing that indicates from July 8th to the 14th that you answered a call and could have heard an audible click. Do you see that?
A. I do.
Q. Which of these calls were answered?
A. I have no idea, ma'am, but I know I talked to these people.
Q. Okay. But let's just -- this is the interrogatory response that you provided under penalty of perjury.
A. I didn't answer those calls. They

Page 151

were rejected.
Q. So on July 8th, it says you rejected three calls and received one voicemail. Do you see that?
A. Yeah.
Q. Did you answer any phone call on July 8th?
A. Not to my knowledge.
Q. Okay. On July 9th, it states that you rejected two calls. Do you see that?
A. Yeah.
Q. Did you answer any call on July 9th?
A. No. They were rejected. I'm pretty sure it's in the call log.
Q. On July 10, 2023, it indicates that three calls were rejected. Did you answer any call from Sunrun on that day?
A. On which day?
Q. July 10th.
A. No, but I did call back. I remember -- I remember talking to them twice on callback. I don't know exactly the days, but I did call them.
Q. Okay. And then on July 11th, it says three rejected calls and one voicemail. Do

Page 152

you see that?
A. Yeah.
Q. Did you answer any phone calls on July 11th?
A. Not to my knowledge -- I don't know, ma'am. You're showing me dates where it says they were rejected. And if they have the call logs, then they were rejected. They were rejected because of the continuous calling.
Q. But, Ms. Strickland, I'm showing you your interrogatory response that you signed under penalty of perjury.
A. Yeah.
Q. That's what we're talking about.
A. If it says rejected, it's rejected. No, I did not.
Q. So on July 12th, you didn't answer any calls, correct?
A. No. 13th or 14th.
Q. Or 14th. Okay. So in the complaint where you allege that you indicated that you received calls from the 8th to the 14th and that you answered a call and heard an audible click, which call did that happen on?
A. The audible click was on the

Page 153

voicemail, ma'am.
Q. That's not what the complaint says.
MS. MAZZUCHETTI: Emily, let's pull up the complaint.
THE WITNESS: I'm not really sure.
BY MS. MAZZUCHETTI
Q. Let's pull up Page 4 of Exhibit 10. And paragraph 25, it says: Each call that was answered started with a click, pause, and a delay prior to any individual from the Defendant getting on the line. Paragraph 26: The audible click and pause is indicative of the automated system selecting a number to call and then transferring the call to the telemarketing representative.
A. Okay. I'm not sure.
Q. These allegations -- excuse me -- relate to your allegation paragraph 21 about the calls that what you're claiming here. So did that actually happen or is this just a carryover from this prior complaint? Because your interrogatory responses don't say that you answered any call between July 8th and 14th.
MR. OLIVER: Objection to the form of the question. You can answer if you

Page 154

know.
THE WITNESS: I don't know.
BY MS. MAZZUCHETTI
Q. You can take this down. Okay. Let's go back to the interrogatory response, so Exhibit 9, page 2. Okay. So on July 8th it says: Plaintiff called back and asked not to be contacted further. This statement is repeated with respect to July 10th and July 11th.
You had testified previously that you called back twice. Do you know why it's saying here three times?
A. It could have been because -- I mean, as I told you, I remember twice.
Q. Okay. Could the third time here be an error just as the error with respect to the people who live in your household?
A. I don't know. I don't know.
Q. So when you reviewed this on -- you know, you signed this on January 30th, under penalty of perjury. What did you do to make sure that this information about the phone calls at issue is accurate?
A. I probably should have read it thoroughly, but as I told you, I don't have that

Page 155

kind of time. I mean, I'm struggling with this today.
Q. So did you not read -- well, did you review any documents to corroborate that the information you were providing is accurate?
A. I read this and I guess I signed it. I signed it, but I don't remember reviewing any other documents. Probably should have looked at the call logs before I signed anything, but I didn't have time for all that. I was in a hurry. They were asking me questions, and I don't have -- I don't have time like that.
Q. Why should you have looked at the call logs?
A. Because it's been two years, ma'am.
Q. And what would the call logs show you?
A. I mean, it's been two years. I should have looked at all of it, but I didn't have time to do that.
Q. And if you had, what would have been different?
MR. OLIVER: Objection to the form of the question.
THE WITNESS: The call log you have,

Page 156

ma'am, is calls that -- it's not showing whether I accepted or didn't. It's showing two or three calls on one day, but it's not showing whether I accepted. It's showing that I rejected one, but I don't know about the other ones. So I have no idea. As I said, it's been two years ago. It's been a long time. I don't -- I remember talking to someone about not calling me again with your solar company. I don't remember if it was two, three times, but I know it was two times.
BY MS. MAZZUCHETTI
Q. But what I'm getting at, Ms. Strickland, is that, you know, I'm not the one saying that you rejected the calls. Your interrogatory response says that you rejected the calls. And I'm asking you, what's accurate, your testimony today that you answered calls, the statement in your complaint that you answered calls, or this interrogatory response, or is the answer you just don't know?
A. I don't know.
MR. OLIVER: Objection to the form of

Page 157

the question. Hold on. I'm sorry, Ms. Strickland. Objection to the form of the question. Argumentative. If you understand that, you can answer it.
THE WITNESS: I don't know.
MR. OLIVER: But it's argumentative.
MS. MAZZUCHETTI: Well, your witness was trying to answer the question when you interrupted.
MR. OLIVER: I was inserting an objection properly.
BY MS. MAZZUCHETTI
Q. Ms. Strickland, what is accurate or is the answer that you just don't know?
A. I do not know.
MR. OLIVER: Same objection.
BY MS. MAZZUCHETTI
Q. So you don't know?
A. I don't remember. Give me just a second. You're probably going to have to give me a second in just a minute because Lexi's kind of melting down on me.
Q. Do you want to take a break? We can take five minutes now if you need to attend to that.

Page 158

A. Yeah, I have to.
Q. Okay. So it's 2:24. Why don't we just try to come back at 2:35 then.
MR. OLIVER: So 10 minutes, basically, 11 minutes or so?
MS. MAZZUCHETTI: Sure.
(Whereupon, a brief recess was taken.)
MS. MAZZUCHETTI: Back on the record.
THE WITNESS: You missed her. She come out here talking. Couldn't understand it, but...
MS. MAZZUCHETTI: Mr. Oliver, Ms. Strickland indicated that she might need to cook for Lexi at some point soon. If there is a reason to break and finish this off tomorrow, I'm fine with doing that, but I will leave it to you.
THE WITNESS: If we finish it off tomorrow, it's going to have to be in the afternoon.
MS. MAZZUCHETTI: That is fine. I just want to be respectful of your caretaking situation. So I don't want to hold you up.

Page 159

THE WITNESS: I mean, I apologize. I have no control over her. She doesn't -- she'll follow commands but as far as if she gets hungry, the whole neighborhood is going to hear her. It's going to be that bad.
MS. MAZZUCHETTI: Well, we'll see how it goes. But if it gets to a point where you need to go, just let us know and we'll see what we can do.
THE WITNESS: I mean, hopefully we can wrap this up.
MS. MAZZUCHETTI: Yes. Okay. So let's pull up, Emily, document Bates numbered starting with 1471 that goes to Page 1473. Can someone remind me what exhibit we're on?
THE REPORTER: 13.
MS. MAZZUCHETTI: This is 13?
THE REPORTER: Correct. Exhibit 12 was the call logs.
MR. OLIVER: 12 is what? I'm sorry, I kind of lost track here.
THE REPORTER: It was the call logs.
MR. OLIVER: From the phone bill?

Page 160

THE REPORTER: I think it was a phone bill because 11 was a screenshot of the phone.
MS. MAZZUCHETTI: This is Exhibit 13. Mr. Oliver, we'll provide you with all of the exhibits and mark them so it will be clear with the transcript in the deposition.
MR. OLIVER: Okay.
(Whereupon, Defendant's Exhibit No. 13 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, I'm going to show you what's been marked as Exhibit 13. It's something that we produced in discovery. Have you ever seen this document before? Does it look familiar at all?
A. I don't know, ma'am. I can barely see it now, much less tell you if I've seen it before.
Q. Well, I'll represent that this relates to the completion of a web form in May of 2019 that also provided your contact information. Let's scroll to the third page where it says IP Address and User Agent.

Page 161

A. Okay. 2019?
Q. 2019. Let's zoom in a little bit on the user agent. So, Ms. Strickland, do you see where it says user agent string?
A. Yeah.
Q. And next to it in the box in parentheses, there is an indication of Android 9; SM-G955U. Do you see that?
A. Yeah.
Q. So doing some research, that is an indication that the device that completed the web form with your information was an Android, and a Samsung Galaxy device. That is what the codes mean. Is that consistent with the type of phone that you used in May of 2019?
A. I have no idea, ma'am. I don't know. I mean, 2019. I mean, come on. 2019 is how many years ago? I have no idea.
Q. Six years ago, but we talked about --
A. Do you know how many Samsung devices they are in this area and with me in my home? My daughters' is all Samsung. Both of my daughters.
Q. Okay. But I'm trying to figure out

Page 162

which one completed your information on the web form seeking information about solar.
A. I can't imagine my daughter going and anybody in my household going and finding solar on me, because we've never even attempted to get solar ever.
Q. You had testified previously that prior to using the device that you have now, you used a Samsung Galaxy device before that broke. Do you remember testifying about that?
A. Yeah, but I don't remember what it was.
Q. You testified that you had that for three or four years. So if you began using the device you have now in 2023 --
A. The one before that was a Z Fold, and I had it -- I know I had it two years because I paid it off.
Q. Okay.
A. This one was two years. I just paid it off.
Q. Ms. Strickland, I can also represent to you that the IP address that we see at the top of the screen also geolocates to an area near where you work and live. But is it your

Page 163

testimony that you did not populate any web forms in May of 2019 related to solar?
A. Okay. I don't recall. 2019? No, I don't recall it, so I can't answer that.
Q. Okay. We can bring that down. Do you have air conditioning in your house, Ms. Strickland?
A. Of course I do. I live in Florida.
Q. I don't know. I live in New Jersey.
A. It's pretty hot in Florida. It's 112 degrees was the highest temperature.
Q. Well, I would think you would need air conditioning.
A. Lexi wouldn't be able to breathe.
Q. Did you have to install the air conditioning at your home, or was it there when you moved in?
A. No, I replaced it. This one wasn't here when I moved in. It's brand -- it's a few years old.
Q. Do you remember when you replaced it, around what year?
A. No, I don't remember the exact year. I know it took me a while to pay it off. I don't know exactly.

Page 164

Q. Was it during the pandemic or prior to the pandemic?
A. It was after the pan -- it was after everybody went back to work, which I never missed work so. My employees did but I didn't. I can't remember.
Q. Okay. Where were you working in May of 2019?
A. Oh, God. I would have to think back. 2019? I think IHOP. I think. It was not done when I was at IHOP. I think it was done when I was at Five Guys. That's when the air conditioner was replaced. I don't remember. I just know the air conditioner that was in here was 30 years old.
MS. MAZZUCHETTI: Understood. Okay. Let's pull up, Emily, the next exhibit, the document that starts with 1505.
(Whereupon, Defendant's Exhibit No. 14 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, I'm putting before you what we've marked as Exhibit 14. I will represent to you this is a document that we produced in discovery that relates to another

Page 165

web form, a solar related web form, that was completed with your information on March 29, 2020.
MS. MAZZUCHETTI: Can we scroll to the third page of this document, please, Emily.
BY MS. MAZZUCHETTI
Q. I can show you, Ms. Strickland, that we have another IP address here that starts 174. I can tell you that that relates to a geographic region near where you live and work. Do you recall completing a web form related to solar in March of 2020?
A. I do not. In 2020, I'm trying to remember where I was at in 2020. If it's -- I was in Jacksonville in 2020.
Q. What were you doing in Jacksonville?
A. Working at IHOP, if I'm not mistaken. I'm not really sure. I gotta think back. God.
Q. Jacksonville is not so far from your home in Lake City, correct?
A. Sixty miles.
Q. So you don't recall whether or not you completed a web form in 2020 related to

Page 166

solar?
A. No, I don't. I mean, 2020, that's six years ago. I can't remember two years, much less six years. I'm trying to remember where I was at in 2020. Four years after mom passed. I can't remember, ma'am. I'm sorry. But I don't -- I don't -- I don't recall ever filling out a form for anything pertaining to solar.
MS. MAZZUCHETTI: Okay. Let's move on to the next exhibit, 15. Let's do the document ending in 1501.
(Whereupon, Defendant's Exhibit No. 15 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, I'm presenting before you what we're marking as Exhibit 15, and I will tell you this is another document that we produced in discovery that relates to another web form completed with your information. We can turn to page -- the third page of this document. The web form was completed on May 11, 2020, at 6:52 p.m. Eastern time, from a IP address starting with 73. Do you see that?
A. Uh-huh.
Q. Is that a yes?

Page 167

A. I see it. Well, I see it's a blur, but I see. I can't make it out.
Q. Do you recall completing a web form related to solar on May 11, 2020?
A. No, I don't.
Q. Is that the time that you would have been in Jacksonville also?
A. 2020, I believe I was in Jacksonville. At 6:00 p.m., I was in Jacksonville at IHOP 103rd, I believe.
Q. And this IP address, the 73.[redacted], is pointed to Jacksonville. Does that help refresh your recollection of whether --
A. I did not. I have not submitted any form on -- I know I haven't. I haven't solicited any solar whatsoever. I have to look at this. They're texting me from my job.
Q. Do you need to take a break?
A. No. Just somebody calling out. No, I know for a fact I didn't put any of my information in. I'm going -- but I will tell you this. I will ask my children. My oldest daughter lives in Jacksonville. She's been in and out of Jacksonville since 2016.
Q. What is her address? Where did she

Page 168

live in 2020?
A. She left my house right after my mom passed in 2017, and she was in Jacksonville. She's been in Jacksonville ever since. She was in Tampa for about three months. Then she went to Jacksonville. But I will be asking.
MS. MAZZUCHETTI: Okay. Emily, if you can pull up the exhibit ending in 1730.
(Whereupon, Defendant's Exhibit No. 16 was marked for identification.)
BY MS. MAZZUCHETTI
Q. This will be Exhibit 16 to the deposition. Ms. Strickland, I've put on the screen what we've marked as Exhibit 16. This is another document that we produced in discovery, and it's another document that relates to the completion of a web form with your information.
MS. MAZZUCHETTI: Emily, if you could turn to the third page.
BY MS. MAZZUCHETTI
Q. It appears that this web form was completed either on December 27 or 28, 2020, from an IP address that starts in 73 that also points to Jacksonville, Florida. Did you complete this web form seeking information about

Page 169

solar in late December 2020?
A. Not to my knowledge, ma'am. I mean, I'm adamant about it. I know I didn't put my information in there.
Q. Take that down.
A. I don't own a house in Jacksonville. If I remember, COVID started in '23; is that correct? March of '23 is when the shutdown happened?
Q. I believe it was 2020.
A. Was it 2020?
Q. Yes.
A. Okay. I was in Valdosta, Georgia.
Q. When were you in Georgia?
A. Before I went to -- COVID shutdown, I was in Lake City and then from Lake City, I was in Jacksonville. Then I went to Valdosta, Georgia.
Q. When did you go there?
A. I can't remember. God, I'm trying to. I'm trying to remember the dates.
Q. Did you live there? You said you went there. Were you visiting?
A. No, ma'am. I was working 12, 13 hours a day. I'm trying to remember. I was all

Page 170

over with IHOP. I was in Jacksonville one minute; Valdosta the next. IHOP didn't supply -- I had to drive home every time from Jacksonville and Valdosta. Valdosta is 60 miles from here. It's across state line.
Q. Okay.
A. I'm trying to remember. COVID shutdown was in 2020. Because I remember I came to Lake City, opened the IHOP here. It was the end of March, I believe, of 2020. Before that, I was in and out of Jacksonville. And then after March of 2020, I was in Valdosta. I think the Lake City IHOP reopened in February of 20 -- if that was 2020. God, I can't remember. I'm not good with dates.
Q. Okay.
A. But I went to Valdosta after Lake City, the IHOP, and the COVID shutdown. I was in -- I think I was only in Jacksonville for about a week, and then I went to Valdosta.
Q. Okay. So I want to just make sure I understand the calls for which you're claiming in this lawsuit. You feature in the complaint calls that occurred between July 8th and July 14th, 2023. Are you claiming in this lawsuit

Page 171

for any other phone calls other than those that we went through in your interrogatory responses and the complaint?
A. Ma'am, there were so many calls, I don't know. I mean, I don't know.
Q. Are you --
A. Then, I mean, even if -- in 2019 and you're still calling me in 2023? Come on. Do you know how long that is? Four years. That makes no sense to me.
Q. With respect, Ms. Strickland, my client calls only when somebody requests information through the web forms, and what was presented looked like someone genuinely requesting information so that's why it covered that long time period.
A. I mean, I don't -- I don't recall filling out any form whatsoever myself on any solar, period. One, the price of it is so high I couldn't afford it. So, you know, even with the inheritance of the property, it would not allow me to do it. It took all I could do to get the mortgage.
Q. How do you know how much it costs to get solar?

Page 172

A. I can imagine it's -- it's a good bit.
Q. But based on what?
A. Just based on common sense. Nothing is free, not even with a tax credit. Just like this air conditioner, they claim they gave me a tax credit, but yet, the air conditioner cost me quite a bit.
Q. Can you please explain to me what about the phone calls that you're claiming in this case is problematic?
MR. OLIVER: Objection to the form of the question.
THE WITNESS: They kept calling, ma'am.
MR. OLIVER: I'm sorry, Ms. Strickland, I'm going to object sometimes. Just give me a second. I think I've objected already, but if you know the answer, go ahead.
THE WITNESS: I mean, the calls were irritating. Every time you turn around, they're calling, calling. It's enough. People have other things going on in life. You call once, they don't answer,

Page 173

you leave a voicemail and let it be done. There's no sense in harassing somebody. If they want to call you back and get the stuff, they call you back.
BY MS. MAZZUCHETTI
Q. Is the basis for your claim in this case that your phone number was registered on the National Do Not Call Registry?
MR. OLIVER: Objection. Lacks foundation. If you know the answer, you can answer.
THE WITNESS: I don't know the answer. No, no. I mean, not -- the basis of my call is, you harassed me consistently.
BY MS. MAZZUCHETTI
Q. Did you ever register your cellphone number on the National Do Not Call Registry?
A. I sure did.
Q. When did you do that?
A. Not knowing anything about any lawsuit anywhere. Trying to stop some of the phone calls.
Q. When did you do that?
A. I don't remember exactly, but I remember doing it. Of course, I did it. I also

Page 174

did the home phone number, but it didn't stop
them from calling and leaving messages.
Q. What was the home phone number?
A. The [redacted].
Q. Okay. So that was your phone number
when you had that phone number?
A. No. That was my phone number, my
mother's phone number. My mother never allowed
us to use her phone. If it was a job interview,
she'd cuss them out. I would go to a job
interview, they would say, you know your mom
cussed me out. So I never used that past, I
believe, 2000 -- after I got here, 2009, 2008.
I never used that number because of that.
She didn't care how many times you
told her. Hey, momma, somebody is going to call
me. She would tell you quick, this is my phone.
This is not theirs. Call them on their
cellphone. Click. So we got -- that's why we
cut it off because nobody ever used -- even
after she passed, we were still conditioned not
to use that phone.
Q. But you kept it and were paying for
it?
A. I was paying for it, ma'am, because

Page 175

I didn't want to turn loose on my mom.
Q. After your mother passed?
A. Even after she passed. That's why I
hadn't bothered changing it. It's like letting
go.
Q. Do you need to take a break, Ms.
Strickland?
A. I'm sorry, I can't talk about my
mom.
Q. I certainly did not mean to upset
you. So why don't we just take a break and get
some water. We can come back at ten after.
Does that work for you, Ms. Strickland?
A. That's fine.
(Whereupon, a brief recess was
taken.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, did you speak with
anybody about the case on the break?
A. No.
Q. Did you communicate on the phone
with anybody about the case on the break?
A. No. I just let Mr. Oliver know that
it's going to be soon that Lexi is showing out
in there throwing herself down, and I don't want

Page 176

her to hurt herself.
Q. Certainly not. You mentioned your
daughter, Sharon, lives in the Jacksonville
area; is that correct?
A. Yeah. But I haven't talked to her,
but I'm going to find out if she solicited any
information using mine. They were having to
help me some with the bills because, you know, I
had both of her children at the time.
Q. When you were replacing the air
conditioning in 2021, were your daughters
helping you get pricing and research options?
A. They might have been, but I went
through -- the advertiser had somebody here,
Epic. That's where I got that from.
Q. I'm sorry, who had somebody?
A. The advertiser. Lake City
advertiser.
Q. Did you do any Internet research at
the time looking for pricing or possibilities
with respect to your air conditioner?
A. I don't remember, ma'am. I might
have. I don't know. Like I told you, my air
conditioner was 30 something years old. When
they pulled it out of here, I was stunned at

Page 177

what come out of the inside of my house.
Q. Gosh. Back to Sharon in
Jacksonville. Do you know her current address?
A. I don't have her current address. I
can get to her house, but I don't know the
address.
Q. Whereabout in Jacksonville does she
live?
A. Orange Park.
Q. Is that near like where the football
team plays?
A. I don't know. I don't know. I
don't know.
Q. Like where is Orange Park?
A. It's off 395. It's right as you
come in. You come into Jacksonville, you're --
oh, God, you're in Jacksonville. It says
Jacksonville city limits, 20 minutes before you
get to Orange Park.
Q. Does Sharon go by the name Sharon
Strickland or does she have a different name
that she goes by?
A. She was Washington up until a year
ago when she married a Butler.
Q. Have you ever been to a place called

Page 178

the Cowford Chophouse in Jacksonville?
A. The what?
Q. Cowford Chophouse?
A. No. Not to my knowledge.
Q. Where does your daughter work, Sharon?
A. She's an aid for a handicapped individual.
THE REPORTER: Is that Calford, C-A-L-F-O-R-D or C-O-W?
MS. MAZZUCHETTI: C-O-W.
THE REPORTER: Okay. Thank you.
THE WITNESS: I have no idea what that is or where it's at or anything.
BY MS. MAZZUCHETTI
Q. Okay. How long has Sharon lived at the address she lives at presently?
A. I don't know, because Sharon and I fell out because of her choice in mate. He doesn't like me too much.
Q. When did you fall out?
A. Sharon gets Lexi every other weekend. I mean, I only see her every -- sometimes I don't see her at all because I'm at work, and she picks Lexi up. And I had her

Page 179

youngest, Tooky, Kadecia. There was a time when we didn't speak right after she left, I think a couple of years. My daughter had to be a mom or I wasn't having it.
Q. Understood.
THE REPORTER: Can you spell Tooky and Kadecia, please?
THE WITNESS: Kadecia and Tooky are the same person. We call her Tooky because her name is difficult. Kadecia is my second born grandchild. She's grown and doesn't live here anymore. She hasn't lived here in two years.
THE REPORTER: I'm just asking for the spelling because I have to spell it.
THE WITNESS: Kadecia is K-A-D-E-C-I-A, but they're the same individual. Tooky is T-O-O-K-Y. It's much easier than Kadecia. She's been called Tooky since she was born.
BY MS. MAZZUCHETTI
Q. How old is Tooky?
A. She's fixing to be 21.
Q. Did she live with you at your Hubble Street address prior to moving away?

Page 180

A. Yes.
Q. How long did she live with you?
A. I had her from 2006 until she left two years ago.
Q. So she left sometime in 2023?
A. Yeah. It was '24.
Q. Twenty-four?
A. Yes, ma'am. It might have been the end of '23, 2024. I can't remember exactly when she left.
Q. Where does she live now?
A. Lake City.
Q. Okay.
A. Nana doesn't approve of her -- Nana doesn't approve so I don't see her often. Every now and again she needs to wash clothes, she'll come see me.
Q. I'm sorry, who doesn't approve?
A. I don't approve of her living the way she lives her life. I raised a lady. You know what I mean? That's all I'm going to say.
Q. Okay. You're talking about Tooky, not Sharon?
A. Yeah. Sharon as well.
Q. You mentioned Sharon's a care

Page 181

provider. Do you know what location she works at?
A. I don't. I know she was in Fernandina Beach at one point. She goes from place to place. Now she's with an individual, and I don't know where that individual lives.
Q. Somewhere in the Jacksonville area, do you believe?
A. Yeah, it is in the Jacksonville area.
MS. MAZZUCHETTI: Emily, can you pull up the document that's Bates No. Strickland 2. And this will be Exhibit 17.
(Whereupon, Defendant's Exhibit No. 17 was marked for identification.)
BY MS. MAZZUCHETTI
Q. Ms. Strickland, have you ever seen this document before that we've put up as Exhibit 17?
A. Yeah, I'm pretty sure I have.
Q. What is this document?
A. That's the Do Not Call Registry.
Q. Do you see there it looks like this is a screenshot off of a phone. Like, is this

Page 182

something that you pulled or something that your counsel or counsel's assistant pulled?
A. If it's an email like that or -- I -- I probably pulled it and sent it to them. I'm not sure. I don't remember.
Q. Do you see that there's -- it looks like there's two emails. One from 11:18 a.m. and then there's another for 11:51 a.m. Do you see that below?
A. Well, what probably happened is I was trying to make sure I was a registered person because I was getting all these calls, and I wanted to stop them.
Q. Do you remember actually pulling this record, or is this just something you're speculating about?
A. I'm speculating. I don't remember. I really don't.
Q. Okay.
A. The honest answer is, I don't remember.
Q. Okay. I'm just looking up if anything on this record would confirm for you that it was from your phone or not. Is the background on your phone generally black or

Page 183

white?
A. I don't know, ma'am. I ain't never paid attention to it.
Q. Do you get emails on your phone?
A. I do. I'm looking for you. It's black. So I could have -- I probably pulled it and sent it to them. I mean, I don't know. I can't say I did or didn't. I know she couldn't have gotten my email because -- well, I don't know if she went into my email, because I gave it to her. I gave her permission to go in.
Q. Who did you give your email to?
A. Farideh, the assistant.
Q. And you gave her your account credentials and password for your --
A. Comcast, yes, ma'am.
Q. Do you know whether she accessed that email?
A. I don't know. I don't -- it's been so long ago, I don't know. I know that I -- I remember seeing that email years ago about me -- I already registered. I was trying to register again, I guess, and I got an email from them telling me when I registered.
Q. Okay. Is this something --

Page 184

A. I don't recall it at all. I mean, I don't.
Q. Is this something you're actually recalling, like that you tried to register it again?
A. Well, looking at it, I don't know. I don't remember. I know it's from the Do Not Call. It's on there. I'm registered. I tried to -- I remember trying to register and it sending me -- I think it sent me an email. Hell, I don't remember. That's been so long ago, it's hard to remember things like that.
MS. MAZZUCHETTI: Mr. Oliver, we'll just ask for the whole email trail on this rather than this excerpt because it makes it, obviously, difficult for The Witness to testify to, and we don't know what we're looking at either.
MR. OLIVER: Well, I'll make a note of that. Let me see from the zero, zero, zero.
THE WITNESS: I mean, if it can even be gotten anymore. Does it tell the date?
MS. MAZZUCHETTI: I don't see a date.

Page 185

THE WITNESS: I see a time.
MS. MAZZUCHETTI: If we had the full email, obviously you could see the date.
MR. OLIVER: I'll have them look into that.
MS. MAZZUCHETTI: Okay.
THE WITNESS: Yeah, I don't see a date on it. I don't know, ma'am. I really don't.
How much longer?
MS. MAZZUCHETTI: Probably have another hour or so.
THE WITNESS: Can we finish this up tomorrow?
MR. OLIVER: I am fine with that. Let me check my schedule. What time would you be available?
THE WITNESS: Okay. Make sure it's Eastern time, though.
MS. MAZZUCHETTI: Yes. I'm on Eastern also.
THE WITNESS: Okay. It has to be after -- God, can it be after three, around 3:30?
MS. MAZZUCHETTI: I can make that

Page 186

work, yes. Does that work for you, Mr. Oliver?
MR. OLIVER: I'm checking something. I could probably -- I can probably move some stuff around and see if I can get that to work.
So what time did you have in mind specifically?
THE WITNESS: 3:30.
MR. OLIVER: 3:30 Eastern?
THE WITNESS: That will give me time to do what I need to do and get Lexi situated where I'll have a couple hours to do what I need to do.
MR. OLIVER: Okay. We can make that happen.
MS. MAZZUCHETTI: Okay. Ms. West, do we need to ask for you or should we coordinate directly with Veritext?
THE REPORTER: I would follow up with Veritext. Have your assistant let them know that you're rescheduling it for tomorrow because I'm not in charge of the scheduling. I don't know where they're going to put me tomorrow. You can ask

Page 187

for me, but that doesn't mean you're going to get me.
MS. MAZZUCHETTI: I just want to note for the record that the deposition is remaining in progress, and, Ms. Strickland, you know, as you may understand already, you know, when we're on breaks, like --
THE WITNESS: Yeah. I do want to know if I can ask Sharon and Audrey if they did anything with my name.
MS. MAZZUCHETTI: Well, I can't give you direction on that, but what I can tell you is that --
THE WITNESS: Or should I just wait until the deposition is over?
MS. MAZZUCHETTI: I can't give you direction on that.
MR. OLIVER: Yeah, just wait. Just wait.
THE WITNESS: Okay.
MS. MAZZUCHETTI: But if you talk with anybody about the lawsuit or review any documents overnight, I'm going to ask you about that. Make sure you keep a clear

Page 188

trail of who you talked to and what communications you had. But with that --
THE WITNESS: I don't plan on talking to anybody about it. I'm fixing to go in here and take care of my grand.
MS. MAZZUCHETTI: I understand. Okay. So we will reconvene tomorrow at 3:30. And I believe I should be able to be done in an hour, but if it goes for two hours, I don't think there's any chance it will go longer than that.
THE WITNESS: All right. I appreciate that.
(Whereupon, the deposition was adjourned at 3:30 p.m.)

AND FURTHER DEPONENT SAITH NOT.
------------------

Page 189

CERTIFICATE OF DEPONENT

I have read the foregoing transcript of my deposition and except for any corrections or changes noted on the errata sheet, I hereby subscribe to the transcript as an accurate record of the statements made by me.

______________________________
SHERRY STRICKLAND

SUBSCRIBED AND SWORN before and to me this ____ day of ________________, 20___.

________________________________
NOTARY PUBLIC

My Commission expires:

CERTIFICATE OF OATH

STATE OF FLORIDA )

SS:

COUNTY OF PALM BEACH )

I, ANDREA DENISE WEST, R.P.R.,F.P.R. and Notary Public, do hereby certify that SHERRY STRICKLAND, appeared via videoconference on the 10th day of November, 2025, was sworn by me for the purpose of giving testimony in the matter of STRICKLAND v SUNRUN INC..

She produced a driver's license as identification.

WITNESS MY HAND AND SEAL this 10th day of November, 2025.

ANDREA DENISE WEST, RPR, FPR
Notary Public - State of Florida
My Commission No. HH 379516
Expires: JUNE 3, 2027



CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF PALM BEACH )

I, ANDREA DENISE WEST, R.P.R., F.P.R. and Notary Public, do hereby certify that I was authorized to and did stenographically report the deposition of SHERRY STRICKLAND, that a review of the transcript was not requested, and that the foregoing transcript, Pages numbered 1 through 188, is a true record of my stenographic notes.

I further certify that I am neither attorney or party, nor am I related to or employed by any attorney or party connected with the action, nor am I financially interested in the action.

WITNESS MY HAND AND SEAL this 24th day of November, 2025

ANDREA DENISE WEST, RPR, FPR



ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Strickland, Sherry v. Sunrun Inc.
DATE OF DEPOSITION: 11/10/2025
WITNESSES' NAME: Sherry Strickland

| PAGE | LINE (S) | CHANGE | REASON |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

__________________________
Sherry Strickland

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF ____________, 20__.

____________________ ____________________
(NOTARY PUBLIC) MY COMMISSION EXPIRES: